1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11

TRACEY ANNE P.,

12                                        Plaintiff,

13    v.

14    KILOLO KIJAKAZI, Acting
      Commissioner of Social Security,[1]
15
16                                        Defendant.

Case No.:  20cv1163-LAB(RBB)

**REPORT AND
RECOMMENDATION REGARDING
CROSS-MOTIONS FOR SUMMARY
JUDGMENT [ECF NOS. 17, 21]**

17
18
19
20
21
22
23
24

On June 24, 2020, Plaintiff Tracey P.[2] commenced this action against Defendant

Kilolo Kijakazi, Acting Commissioner of Social Security, for judicial review under 42

U.S.C. § 405(g) of a final adverse decision for disability insurance benefits and

supplemental security income [ECF No. 1].  Defendant filed the Administrative Record

on December 19, 2020 [ECF Nos. 12-13].  On February 24, 2021, Plaintiff filed a Motion

for Summary Judgment [ECF No. 17].  Defendant filed a Cross-Motion for Summary

Judgment and Opposition to Plaintiff's Motion for Summary Judgment on May 4, 2021

25
26
27
28

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).
[2] The Court refers to Plaintiff using only her first name and last initial pursuant to the Court's Civil Local Rules.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

[ECF No. 21].  Plaintiff did not file a reply brief.  On September 8, 2021, Plaintiff filed a Notice of New Authority [ECF No. 24].

The Court has taken the motions under submission without oral argument [ECF No. 14].  For the following reasons, the Court recommends that Plaintiff's Motion for Summary Judgment be **GRANTED**, Defendant's Cross-Motion for Summary Judgment be **DENIED**, and the case be remanded for an award of benefits.

## I.   BACKGROUND

### A.   Procedural Background

Plaintiff Tracey P. was born in 1981 and completed high school in 1999.  (Admin. R. pt. 1 Attach. #6, 257, 262, ECF No. 12.)[3]  Between January 2001 and June 2006, she held positions as a staff person for a group home, vocational specialist, residential counselor, assistant director at a developmental disabilities day program, and private school instructor.  (Id. at 270.)  She stopped working in June 2006, while pregnant with her first child, for health reasons unrelated to the medical issues in this case.  (Id. Attach. #2, at 47-48, 53; id. Attach. #6, at 261.)  On or about June 19 and 25, 2012, Tracey P. filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, respectively.  (Admin. R. pt. 1 Attach. #5, 237-44, ECF No. 12.)  She alleged that she had been disabled since August 31, 2007, due to Chiari I malformation and hydrocephalus.[4]  (Id. at 237, 239; id. Attach. #6, at

---

[3] The administrative record is filed on the Court's docket as multiple attachments.  The Court will cite to the administrative record using the page references contained on the original document rather than the page numbers designated by the Court's case management/electronic case filing system ("CM/ECF").  For all other documents, the Court cites to the page numbers affixed by CM/ECF.

[4] Chiari malformation is a condition in which brain tissue extends into the spinal canal.  It occurs when a part of the skull is abnormally small or misshapen, pressing on the brain and forcing it downward.  Chiari malformation type I develops as the skull and brain are growing; signs and symptoms may not occur until late childhood or adulthood.  Treatment of this condition depends on the form, severity, and symptoms, and may include regular monitoring, medications, and surgery.  In some cases, no treatment is needed.  See Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/chiari-malformation/symptoms-causes/syc-20354010 (last visited Sept. 8, 2021).  Hydrocephalus is an abnormal buildup of cerebrospinal fluid in the ventricles (cavities) within the brain that causes the ventricles to widen, putting pressure on the brain's tissues.  See Nat'l Inst. of Health,

261.)  Plaintiff's applications were denied on initial review and again on reconsideration. (Admin. R. pt. 1 Attach. #4, 152-56, 158-62, ECF No. 12.)  An administrative hearing was conducted on April 16, 2014, by Administrative Law Judge ("ALJ") James P. Nguyen; on September 16, 2014, Judge Nguyen issued a decision finding Plaintiff not disabled.  (Id. Attach. #2, at 25-37, 40-91.)  On August 11, 2016, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 405(g) in a case styled Tracey P. v. Berryhill, Case No: 16-cv-02027-BAS-PCL (S.D. Cal. Aug. 11, 2016).  (Admin. R. pt. 2 Attach. #2, 1847-50, ECF No. 13.)  On August 25, 2017, District Judge Cynthia A. Bashant remanded the case for the calculation and award of benefits, but she subsequently granted the Commissioner's motion to alter the Court's order and judgment and remanded the case for further proceedings on January 23, 2018.  (Id. at 1853-89.)[5]  On March 8, 2018, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ for further proceedings consistent with the court's order.  (Id. at 1892.)

A second administrative hearing was conducted on February 28, 2019, by ALJ Randolph E. Schum.  (Id. Attach. #1, at 1804-23.)  On June 5, 2019, Judge Schum issued

---

https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Hydrocephalus-Fact-Sheet (last visited Sept. 8, 2021).  Symptoms of hydrocephalus in adults include headache, blurred or double vision, and nausea.  (Id.)  The condition may be treated with a shunt, or tube, that is surgically inserted into the brain and connected to a flexible tube placed under the skin to drain the excess fluid. (Id.)  Shunt systems generally function well but may be prone to mechanical failure or infection, and multiple surgeries may be needed over a patient's lifetime to repair or replace a shunt.  (Id.)

[5] In her initial order remanding the action for an award of benefits, Judge Bashant determined that the ALJ erred by failing to articulate sufficient justification for rejecting the opinion of Plaintiff's treating physician, Dr. David Bridgeman, and committed legal error by improperly weighing the opinion of a non-examining physician.  (See Admin. R. pt. 2 Attach. #2, 1876-84, ECF No. 13 (Tracey P. v. Berryhill, Case No. 16-cv-02027-BAS-PCL, Order Granting Pl.'s Mot. Summ. J. 16-24 (Aug. 25, 2017)).)  The Court concluded, "Having reviewed the record, the Court finds that although there may be some doubt as to whether Plaintiff is disabled, there is not a serious doubt."  (Id. at 1887-88 (citing Garrison v. Colvin, 759 F.3d 995, 1021 (9th Cir. 2014)).)  The Court subsequently granted the Commissioner's motion to alter the Court's order and judgment, in which the Commissioner argued that the Court had not given proper deference to the ALJ's unchallenged finding that Plaintiff's subjective descriptions of her symptoms and limitations were not fully credible.  (Id. at 1859-60 (Order Granting Mot. Alter J. 1-2 (Jan. 23, 2018)).)  The case was remanded for further proceedings consistent with the Court's order.  (Id. at 1860.)

20cv1163-LAB(RBB)

a decision finding Plaintiff not disabled.  (Id. [Main. Doc.] at 1593-1605.)  The ALJ concluded that "Pursuant to SSR 00-4p, the undersigned determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles[]" and the Plaintiff is capable of "other work that exists in significant numbers in the national economy."  (Id. at 1604.)  Plaintiff requested a review of the ALJ's decision.  (Id. at 1564-70.)  Counsel for Tracey P., on July 18, 2019, submitted an objection to the ALJ's decision and asserted that the ALJ failed to identify a "significant number of jobs."  (Id. at 1579.)  Counsel concluded, "I enclose the relevant data for your review which provides the actual number of jobs in the cited occupations."  (Id.)  The Appeals Council considered Tracey P.'s written objections, found that "[t]he ALJ relied on the vocational expert's testimony, consistent with 20 CFR 404.1566 and 416.966[,]" and denied the request on April 23, 2020.  (Id. at 1564.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

**B.   Medical Summary**

A review of the medical records in this case reveals a complex medical history including numerous emergency room visits and hospitalizations.[6]  Plaintiff was hospitalized between August 31 and September 2, 2007, with complaints of numbness and tingling in her left arm and left leg, lightheadedness, and shooting pains in the right occipital posterior parietal area.  (Admin. R. pt. 1 Attach. #7, 317-18, ECF No. 12.)  A brain MRI taken on August 31, 2007, showed Chiari I malformation in the posterior fossa.  (Id. at 330, 348.)  Tracey P. experienced chronic headaches for which she sought treatment at the emergency room, consulted with a neurologist at University of California at San Diego ("UCSD") Health, and obtained a neurosurgical opinion.  (Id. Attach. #9, at 631 (emergency room visit on February 15, 2008); id. Attach. #7, at 342-47 (reflecting four visits with neurologist Stephanie Lessig, M.D., at UCSD in 2008); id. Attach. #8, at

---

[6] The Court's medical summary focuses on the records relating to Plaintiff's Chiari malformation and headache-related complaints that she alleges are her primary disabling conditions.

520-21 (visit with neurosurgeon on May 28, 2010).)  She told Dr. Mark S. Stern, a neurosurgeon, that her headaches worsened with activity, her pain interfered with her daily activities, and she had difficulty performing simple activities such as cleaning and cooking.  (Id. at 520.)  Dr. Stern cautioned Tracey P. that surgery carried significant risks and would possibly not relieve her pain.  (Id.)

On August 9, 2010, Dr. Stern performed surgery consisting of suboccipital cranial decompression and bilateral laminectomy at C1-C2.  (Id. Attach. #13, at 1357-59.)[7]  On September 7, 2010, the neurosurgeon inserted a lumboperitoneal shunt to address a leak of cerebrospinal fluid ("CSF") and allow for healing of the dural graft.  (Id. Attach. #8, at 510; id. Attach. #13, at 1298-99.)[8]  Despite placement of the shunt, Tracey P. continued to have CSF leakage and underwent drainage of the fluid collection via CT-guided aspiration on multiple occasions.  (Admin. R. pt. 1 Attach. #13, 1278, ECF No. 12.)  The fluid again re-accumulated, resulting in severe headaches, and on February 22, 2011, Plaintiff underwent further surgery with Dr. Stern to repair the dura leak.  (Id.)

---

[7] Symptomatic Chiari malformation is generally treated with surgery, the goal of which is to stop the progression of changes in the anatomy of the brain and spinal canal and to ease or stabilize symptoms. When successful, surgery can reduce pressure on the cerebellum and spinal cord, and restore the normal flow of spinal fluid.  During decompression surgery, the surgeon removes a small section of bone in the back of the skull in order to reduce pressure on the brain and spinal cord and restore the normal flow of spinal fluid.  See Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/chiari-malformation/diagnosis-treatment/drc-20354015 (last visited Sept. 8, 2021).  A cervical laminectomy, in which a small section of the uppermost cervical vertebrae are removed, is often performed in conjunction with Chiari decompression surgery.  See Nat'l Inst. of Health, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Chiari-Malformation-Fact-Sheet#8 (last visited Sept. 8, 2021).

[8] A lumboperitoneal shunt diverts CSF from the spinal space in the low back into the abdominal cavity. See Medtronic, https://www.medtronic.com/us-en/patients/treatments-therapies/hydrocephalus-shunt/lp-shunts.html#:~:text=A%20lumboperitoneal%20(LP)%20shunt%20diverts,intracranial%20hypertension%20(pseudotumor%20cerebri) (last visited Sept. 8, 2021).  A dural graft is used in neurosurgery to repair the membrane covering the brain and spinal cord.  See id. at https://www.medtronic.com/us-en/healthcare-professionals/therapies-procedures/neurological/dura-mater-repair.html (last visited Sept. 8, 2021).

On May 20, 2011, James H. Kimber, PA (physician assistant) to Dr. Stern, noted that Plaintiff was doing well from her most recent surgery but continued to complain of upper back and upper neck soreness and stiffness.  (Id. Attach. #4, at 1473.)  Tracey P. reported that she was taking Norco for pain relief, Zofran for nausea, and Soma, a muscle relaxer.  (Id.)  PA Kimber was concerned about the strength and addictive quality of these medications, and he prescribed Vicodin to replace Norco and suggested over-the-counter nausea and muscle relaxer medications in the place of Zofran and Soma.  (Id.)  On October 11, 2011, while pregnant with her second child, Plaintiff asked her perinatologist about pain management for her headaches because Tylenol did not provide her with relief.  (Id. Attach. #7, at 401-02.)  He suggested an occasional Percocet or other prescribed narcotic and recommended that she avoid overusing Tylenol.  (Id. at 402.)

Plaintiff made numerous trips to the emergency rooms at Fallbrook Hospital and Palomar Hospital in 2012 with complaints of worsening headaches and nausea.  (See id. Attach. #9, at 720-21 (visit on April 12, 2012), 736-37 (visit on June 18, 2012); id. Attach. #12, at 1194-97 (visit on October 30, 2012), 1178-81 (visit on December 7, 2012), 1117-20 (visit on December 9, 2012).)  On April 12, 2012, the emergency room physician noted that Plaintiff had tenderness in her neck and occiput (back of head). (Admin. R. pt. 1 Attach. #9, 720-21, ECF No. 12.)  Her head CT was negative for bleeding, mass, or hydrocephalus, and Dilaudid and Zofran had dramatically improved her pain symptoms.  (Id. at 721.)  During her visit on June 18, 2012, Tracey P. provided her history of chronic occipital headaches, which she described as an achy sensation.  (Id. at 736.)  She stated that Norco typically controlled her headaches but it occasionally did not provide relief.  (Id. at 737.)  The emergency room doctor noted that Dilaudid and Zofran again eased her symptoms.  (Id.)  In response to Plaintiff's request, the emergency room physician gave her a prescription for Percocet for breakthrough headaches that were not relieved with Norco.  (Id.)  At her October 30, 2012 visit to the emergency room, Tracey P. complained of a headache, dizziness, double vision, and slight nausea.  (Id. Attach. #12, at 1194.)  On physical examination, she initially had paraspinal muscle

20cv1163-LAB(RBB)

tenderness in the neck.  (Id. at 1195.)  A CT scan of her brain showed no acute findings.  (Id. at 1178, 1207-08 (results from CT scan).)  She was assessed with acute severe headache, treated with Dilaudid and Zofran through an IV, and given a prescription for Percocet.  (Id. at 1196.)  In December 2012, Plaintiff was seen at the emergency room twice over the course of three days.  On December 7, 2012, she complained of a severe headache with aching, pressure, and throbbing symptoms involving her entire head, as well as vomiting and photophobia.  (Id. at 1178.)  She was treated with multiple doses of Dilaudid as well as Ativan and Zofran.  (Id. at 1180.)  Two days later, she returned to the emergency room and told the doctor that she still had no relief from her headache.  (Id. at 1117.)  The emergency room physician could not determine an acute cause of her headache, such as a hematoma, meningitis, or subarachnoid bleed, and decided that Plaintiff should be treated symptomatically.  (Id. at 1120.)[9]

Plaintiff also saw David Bridgeman, M.D., her primary care physician, and Dr. Stern's physician assistant, James Kimber, on several occasions in 2012.  (Id. Attach. #10, at 822-26 (May 16, 2012 visit with Dr. Bridgeman); id. Attach. #14, at 1470-71 (May 25, 2012 visit with PA Kimber); id. Attach. #8, at 488-89 (June 8, 2012 visit with PA Kimber); id. Attach. #10, at 994-96 (Sept. 11, 2012 visit with Dr. Bridgeman), 976-79 (Nov. 2, 2012 visit with Dr. Bridgeman); id. Attach. #14, at 1465-66 (Dec. 12, 2012 visit with PA Kimber).  During her May 16, 2012 appointment with physician assistant Kimber, she stated that she had been doing well until recently when she started experiencing neck pain, double vision, occasional dizziness, and nightly nausea, prompting Kimber to recommend new imaging studies.  (Admin. R. pt. 1 Attach. #14, 1470-71, ECF No. 12.)  Tracey P.'s brain MRI showed good decompression of her Chiari I malformation and a cystic structure within the left muscle temporal lobe, and her cervical MRI demonstrated multilevel disc bulging without evidence of stenosis.  (Id.

---

[9] The ALJ's medical summary does not contain any reference to these five visits to the emergency room.  (See Admin. R. pt. 2 [Main Doc.] 1598-1601, ECF No. 13.)

20cv1163-LAB(RBB)

Attach. #8, at 488; id. Attach. #14, at 1465; see also id. Attach. #8, at 471-73 (MRI reports).)  On December 12, 2012, Tracey P. told PA Kimber that her headaches were severe and debilitating.  (Admin. R. pt. 1 Attach. #14, 1465, ECF No. 12.)  He ordered a lumbar puncture to check her CSF pressure, prescribed Zomig for migraine headaches, and recommended a neurology consultation for management of her headaches.  (Id. at 1465-66.)

On May 11, 2013, Plaintiff went to the emergency department at Palomar Medical Center and described an exacerbation of her chronic headaches caused by a recent epidural injection for her chronic neck pain.  (Id. Attach. #11, at 1075-77.)  During a subsequent follow-up visit, she requested that Dr. Bridgeman provide her with a referral to a pain management specialist because her chronic neck and skull pain was getting worse, she was unable to help take care of her children at home due to pain symptoms, injections provided her with no relief, and she had only minor improvement with Valium.  (Id. at 1060.)  Tracey P. saw Dr. Stern, her neurosurgeon, on July 2, 2013, following a visit to the emergency department on July 1, 2013.  (Id. Attach. #14, at 1458-59; see also id. Attach. #12, at 1132-38 (emergency room record).)[10]  His diagnostic impression was of persistent symptoms of headache, and incisional pain at the entry site of the lumboperitoneal shunt in her right upper abdominal quadrant.  (Admin. R. pt. 1 Attach. #14, 1459, ECF No. 12.)  He recommended a spinal tap to measure the pressure of and drain CSF, brain and craniovertebral junction MRI scans, and a Lidoderm patch for the right abdominal incisional pain.  (Id.)  On July 12, 2013, Plaintiff saw Dr. Bridgeman for a hospital follow-up.  (Id. at 1555-57.)  Dr. Bridgeman noted that Plaintiff was still having daily headaches and nausea, and that she was seeing "[n]o improvement after

_____

[10] The ALJ's only reference to this emergency room visit was to observe that the records indicated that Plaintiff "was noted to ambulate independently, she could perform all activities of daily living without assistance, her nutritional status appeared normal, and her behavior was appropriate to the situation." (Admin. R. pt. 2 [Main Doc.] 1599, ECF No. 13 (citing Admin. R. pt. 1 Attach. #12, 1135, ECF No. 12).)

seeing pain specialist and getting epidural injection into C-spine" and "[w]e have tried NSAIDS, muscle relaxers, narcotics, [and] [L]idoderm patches, without improvement." (Id. at 1555.)  Tracey P. informed Dr. Bridgeman that the neurosurgeon, Dr. Stern, did not feel that she had any side effects from her previous surgery for Chiari malformation. (Id.)  Dr. Bridgeman referred her to neurology for her headaches, not otherwise specified, and despite noting a "[c]ontinuous abuse of [o]piates," advised her to continue taking her current medications, which included Norco and Percocet, (see id. at 1555), both of which are opioids.[11]

On January 6, 2014, Plaintiff returned to see Dr. Bridgeman for a follow-up after exacerbated headaches prompted her to visit the emergency room twice over the course of a weekend.  (Id. at 1542.)  She had been given Dilaudid by IV with some relief but described her pain at a level of ten out of ten.  (Id.)  Dr. Bridgeman noted that although Tracey P. normally took Percocet and Valium at home, they no longer controlled her pain symptoms.  (Id.)  He also noted that Plaintiff's recent imaging showed no significant abnormality except mild degenerative disk disease of the cervical spine.  (Id.)  Injections into her cervical spine had not provided relief.  (Id.)  The physician recommended longer-acting pain medication and prescribed a trial of OxyContin in conjunction with Dilaudid (both of which are opioids) to use for breakthrough pain.  (Id. at 1544.)  He also counseled Plaintiff on the risks of narcotic medication (i.e., opioids)[12], including addiction, and required her to sign a pain contract in which she agreed to not obtain medications from other providers or divert medication.  (Id. at 1544-45.)  A week later, on January 13, 2014, Plaintiff's pain level was still at an eight out of ten, so Dr.

---

[11] See Johns Hopkins Medicine, https://www.hopkinsmedicine.org/opioids/what-are-opioids.html (last visited Sept. 8, 2021).

[12] According to the Centers for Disease Control and Prevention, the term "narcotics" originally referred to any substance that dulled the senses and relieved pain.  "Opioid" is now the preferred term to describe such substances.  See Centers for Disease Control and Prevention, https://www.cdc.gov/opioids/basics/terms.html#:~:text=Narcotic%20drugs%20%E2%80%93%20Originally%20referred%20to,preferred%20term%20to%20avoid%20confusion (last visited Sept. 8, 2021).

Bridgeman increased her OxyContin dosage.  (Id. at 1539-41.)  The following week, on January 20, 2014, Tracey P.'s headaches were "much improved."  (Id. at 1536.)

On April 28, 2014, Dr. Bridgeman completed an Impairment Questionnaire regarding Plaintiff's headaches.  (Id. at 1558-63.)  He stated that Plaintiff's prognosis was "poor" in view of her diagnoses of Chiari I malformation, generalized anxiety disorder and depression, and chronic neck pain and headaches.  (Id. at 1558.)  He indicated that Tracey P.'s headaches were "severely intense" and identified other symptoms associated with her headaches including vertigo, nausea/vomiting, malaise, photosensitivity, visual disturbances, mood changes, and mental confusion/inability to concentrate.  (Id. at 1559.)  The severity of Plaintiff's pain "constantly" interfered with her attention and concentration, she was not a malingerer, and she was incapable of even low work stress.  (Id. at 1561-62.)  Dr. Bridgeman noted that his patient's headaches would generally preclude her from performing even basic work activities and estimated that she would likely be absent from work more than three times a month.  (Id. at 1562.)

The remainder of the medical evidence in the record was submitted after the first ALJ decision dated September 16, 2014.  On November 13, 2014, Plaintiff went to the emergency department at UCSD with a pressure-type headache behind her eyes, radiating down the left side of her neck; nausea; and intermittent blurry vision.  (Admin. R. pt. 2 Attach. #6, 2174, ECF No. 13.)  She described her pain level as ten out of ten, and this frontal headache was different from her usual posterior headaches.  (Id.)  Tracey P. was admitted to the hospital for five days, until November 18, 2014, during which hospital physicians concluded that she had symptomatic hydrocephalus and would benefit from cerebrospinal fluid diversion.  (Id. Attach. #7, at 2235-36.)  This diagnosis was reached after a head CT scan showed ventricles that were mildly increased in size and a lumbar puncture showed an elevated opening pressure.  (Id.)  Specifically, the opening pressure was 28; after approximately 30 milliliters of CSF was removed, the closing pressure was 9.  (Id. at 2236.)  Following this "high-volume lumbar puncture" and removal of CSF, Plaintiff reported an improvement in her headache.  (Id.)  At her doctor's

recommendation, she underwent elective surgery for placement of a right-sided ventriculoperitoneal shunt[13] and removal of her lumboperitoneal shunt, which had been "chronically disconnected."  (Id. at 2235-36.)[14]

Two months later, on January 13, 2015, Plaintiff reported to Dr. Bridgeman that her headaches had improved since the placement of the VP shunt but that she still suffered from daily headache pain.  (Id. Attach. #8, at 2511.)  In response to Tracey P.'s request for a less powerful pain medication and muscle relaxer, Dr. Bridgeman prescribed Percocet and Soma.  (Id. at 2511, 2514.)  The following month, on February 10, 2015, Plaintiff explained to Dr. Justin Brown, a neurosurgeon at UCSD Health, that she was doing well following the placement of her VP shunt and her frontal headaches had resolved, but she continued to have the posterior headaches that had been present prior to the frontal headaches.  (Id. Attach. #7, at 2237.)  Dr. Brown noted tenderness over Tracey P.'s occipital nerves.  (Id.)  He ordered a new brain MRI to look at the current status of her Chiari malformation and referred her to a headache specialist to determine if occipital neuralgia could be contributing to her occipital headaches.  (Id.)

Plaintiff received a neurology consultation regarding her headaches from Sean Jeffrey Evans, M.D., of UCSD Health on April 17, 2015.  (Id. at 2238.)  Dr. Evans obtained a medical history from Plaintiff and conducted a complete physical examination. (Id.)  Tracey P. told the doctor that her vertex pain had improved with her shunts but her posterior head pain persisted at a level of four out of ten, worsening with activity; nerve blocks, Propanolol, narcotics, and NSAIDs had provided little relief.  (Id. at 2238-39.)

---

[13] A ventriculoperitoneal ("VP") shunt, or catheter from the head to the abdomen, is used to treat excess CSF in the ventricles (cavities) of the brain.  U.S. Nat'l Library of Medicine, https://medlineplus.gov/ency/article/003019.htm (last visited Sept. 8, 2021).

[14] The ALJ's medical summary does not reference this hospital stay or surgery.  Rather, he noted only that a lumbar spine x-ray taken on November 13, 2014, revealed no abnormalities, a head CT taken on the same date "revealed no new pathology," and a November 16, 2014 abdominal CT scan showed that previous hydronephrosis (swelling of kidney) had resolved and there was "less evidence of kidney stones."  (Admin. R. pt. 2 [Main Doc.] 1600, ECF No. 13 (citing id. Attach. #6, at 2137-38, 2145).)

Dr. Evans's diagnostic impression included chronic daily tension-type headache with "significant medication rebound with multi-time per day [P]ercocet for years," for which he suggested an "aggressive trial" of tricyclic antidepressant (TCA)[15] with nortriptyline and a "marked effort to titrate off [Percocet]"; Chiari malformation, decompressed, exam unrevealing; chronic severe anxiety for which he recommended an immediate psychiatric evaluation; jerking movements, likely due to medications; and intermittent sensory changes in the left arm for which he suspected mild cervical radiculopathy but noted that his exam was benign. (Id. at 2241.) Two months later, on June 18, 2015, Plaintiff reported to Dr. Evans that the new medications had not worked for her, but she had been off Percocet except while hospitalized two weeks before with kidney stones. (Id. at 2242.)[16] Dr. Evans prescribed a trial of valproic acid to treat her headaches. (Id. at 2243.)

On September 25, 2015, Plaintiff returned to Dr. Bridgeman for refills of her medications, including Effexor, Percocet, Soma, Valium, Xanax, and Zofran. (Id. Attach. #8, at 2499-500.) Dr. Bridgeman noted that she was "stable with current meds" and her pain level was six on a scale of ten. (Id. at 2499.) Two months later, Tracey P. advised that she was having more frequent and stronger headaches, her medications were not working, and she was not sleeping well, leading Dr. Bridgeman to add Dilaudid to her prescriptions, increase Percocet to 150 per month for pain, and prescribe a trial of Belsomra for insomnia. (Id. at 2492, 2494.) During visits with Dr. Bridgeman on January 14 and 26, and February 10, 2016, Plaintiff continued to have headache pain.

---

[15] TCAs are approved by the Food and Drug Administration to treat depression and anxiety but are used "off-label" to treat pain syndromes. See Cleveland Clinic, https://consultqd.clevelandclinic.org/beyond-depression-other-uses-for-tricyclic-antidepressants/ (last visited Sept. 8, 2021). TCAs are an alternative to the use of opioids for chronic pain management. (Id.)

[16] Plaintiff has a long history of kidney stones and as of March 12, 2013, had undergone approximately ten lithotripsies (shock waves used to treat kidney stones) and the placement of a ureteral stent. (See Admin. R. pt. 1 Attach. #11, 1089-91, ECF No. 12; see also Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/lithotripsy (last visited Sept. 8, 2021).)

(Id. at 2487 ("Overall, pain is fairly stable on meds. Pain 6/10."); 2483 ("Chronic headaches about the same."); 2480 (Toradol injection given for headaches because Plaintiff reported her pain medications were not helping).)

Plaintiff made trips to the emergency room on February 16, 2016, and May 8, 2016. (Id. Attach. #7, at 2243, 2256.) During the February visit, she stated that her chronic headaches had been an eight out of ten for the past several months but recently had been ten out of ten. (Id. at 2251.) Neurosurgeon Dr. Joel R. Martin was consulted but determined that neurosurgical intervention was not immediately needed; Tracey P.'s head CT scan showed no change in ventricular size and she was neurologically stable with no focal neurological finding on exam. (Id. at 2253-54.) Upon discharge, she was advised to follow up with neurosurgeon Dr. Brown, whom she had seen previously. (Id. at 2254.) During the May visit to the emergency room, Plaintiff complained of nausea, vomiting, increasing headaches, "kidney pain," a thirty pound weight loss, and night sweats. (Id. at 2256-57.) She reported using marijuana one to two times a day, and her current medications included Venlafaxine, Percocet, Soma, Dilaudid, Phenergan, and Ambien. (Id. at 2257-58.) Emergency room physicians explored the possibility of shunt failure but no evidence of hydrocephalus was found on a head CT scan. (Id. at 2260.) Plaintiff was advised to follow up with neurosurgery on an outpatient basis and to cease marijuana use. (Id. at 2261.) Plaintiff's "kidney pain" was believed to be due to bilateral nephrolithiasis shown on abdominal x-rays and lab work. (Id.)

During an office visit with Dr. Bridgeman on May 10, 2016, two days after being seen at the emergency room, Tracey P. reported that she had run out of Percocet early because her headaches had been "horrible." (Id. Attach. #8, at 2472.) The doctor observed that his patient was "actively withdrawing" with nausea, cramping, sweating, and malaise. (Id.) Dr. Bridgeman, during a subsequent office visit on August 5, 2016, noted that Plaintiff's pain level was "stable on current meds" but remained at a level of four out of ten. (Id. at 2464.) On August 30, 2016, Plaintiff returned to her doctor and complained of dizziness and lightheadedness. (Id. at 2460.) Dr. Bridgeman felt these

orthostatic changes were likely due to narcotic withdrawal.  (Id. at 2462.)  He had warned Tracey P. on several occasions that her pain medications needed to last thirty days as prescribed.  (Id.)  He agreed to refill her prescriptions but cautioned Plaintiff that she would be terminated from his practice if this became a frequent recurrence.  (Id.)  Approximately two months later, Tracey P. presented to Dr. Bridgeman's office with headache pain of nine out of ten in intensity and depressed mood.  (Id. at 2452.)  Dr. Bridgeman assessed major depressive disorder, severe, and generalized anxiety disorder; increased the dosage of Effexor; and recommended a psychiatric evaluation.  (Id. at 2455.)

On January 3, 2017, Plaintiff went to the emergency department at Palomar Medical Center with increased left posterior neck pain, sharp shooting pains to the right side of her neck, and numbness and tingling in her upper extremities.  (Id. Attach. #9, at 2673-74.)  Her CT scan showed a new lytic lesion at C4.  (Id. at 2679.)  She was admitted to the hospital for neurosurgery consultation, further workup, treatment, and pain control.  (Id.)  Tracey P. reported a pain level of ten out of ten during a hospital follow up with Dr. Bridgeman six days later on January 9, 2017.  (Id. at 2747.)  Dr. Bridgeman noted that an MRI showed a right C5 lesion with pathological fracture and a PET scan of the cervical spine was needed.  (Id.)  The PET scan showed no evidence of malignancy within the lytic lesion.  (Id. Attach. #8, at 2528-29.)[17]  Plaintiff was again admitted to the hospital from March 30, 2017, to April 3, 2017, with headache, nausea, and vomiting symptoms.  (Id. Attach. #9, at 2663.)

On November 20, 2017, Plaintiff went to Fallbrook Family Health Center for a medication refill and saw Dr. Allison Lovell.  (Id. at 2560, 2564.)  Tracey P. revealed that medical marijuana had gotten her off pain medications, which she had taken for years, but she still could not afford to buy it and was taking Vicodin once or twice a day.  (Id. at

---

[17] ALJ Schum's medical summary for January 2017 references the negative PET scan but not the hospital admission.  (Admin. R. pt. 2 [Main Doc.] 1601, ECF No. 13.)

2560.)  Dr. Lovell assessed chronic narcotic dependence, reviewed a pain contract with Plaintiff, and refilled Plaintiff's prescriptions.  (Id. at 2563-64.)  Plaintiff attended psychotherapy appointments regularly between September 11 and December 4, 2017.  (Id. at 2711, 2718, 2721, 2725, 2729.)   Licensed Clinical Social Worker Laura Gilroy assessed generalized anxiety disorder and persistent depressive disorder.  (Id. at 2716, 2723.)  Ms. Gilroy noted that Plaintiff felt like a "bad mom" to her daughters, ages five and ten, because her pain kept her from playing with them; Gilroy assisted Tracey P. with identifying ten activities that she could enjoy with her children that would not exacerbate her pain.  (Id. at 2713, 2718-19.)  After participating in several psychotherapy sessions and employing cognitive behavioral therapy tools, Plaintiff's mood improved and she was able to engage in enjoyable activities with her daughters that did not increase her pain.  (Id. at 2725-26.)  Tracey P. also described having had a negative experience with a doctor who treated her as "drug seeking."  (Id. at 2721.)

On November 30, 2017, Plaintiff consulted with neurosurgeon Dr. Joseph D. Ciacci at UCSD Health regarding her Chiari malformation.  (Id. Attach. #8, at 2387.)  She described a constant "sensation of pressure" feeling in the top of her neck and base of her skull with a pain level of five out of ten, in addition to other symptoms.  (Id.)  She was taking Norco twice a day and using a marijuana vapor pipe for pain relief.  (Id.)[18]  Tracey P. stated that she had difficulty walking when she experienced dizzy spells, which occurred two times a day, and her pain was worse with activity, exercising, and bending over.  (Id.)  On March 15, 2018, following diagnostic exams including a nuclear medicine

---

[18] Norco and Vicodin are similar in that they both contain acetaminophen and hydrocodone. The difference between these medications are the proportions of the two ingredients contained in each formulation.  Vicodin is only available as 5mg hydrocodone and 500mg acetaminophen, whereas Norco has three different strengths (5mg hydrocodone/325mg acetaminophen, 7.5mg hydrocodone/325mg acetaminophen, and 10mg hydrocodone/325mg acetaminophen).  See Johns Hopkins Medicine, https://www.hopkinsmedicine.org/opioids/what-are-opioids.html (last visited Sept. 8, 2021); see also Drugs.com, https://www.drugs.com/medical-answers/norco-vs-vicodin-3039078/ (last visited Sept. 8, 2021).

CSF flow shunt evaluation and a shunt series, (see id. Attach. #6, at 2164-65; id. Attach. #8, at 2403), Dr. Ciacci recommended exploration of the right-sided VP shunt with possible revision and replacement.  (Admin. R. pt. 2 Attach. #8, 2407, ECF No. 13.)  Dr. Ciacci performed a revision of the shunt in May 2018 with no complications.  (Id. [Main Doc.] at 1638; id. Attach. #9, at 2586.)

In late 2018, at Dr. Papalia's referral, Plaintiff saw Dr. Kaleem Uddin, a neurologist, for evaluation of bilateral carpal tunnel symptoms.  (Admin. R. pt. 2 Attach. #9, 2594-95, ECF No. 13 (Sept. 10, 2018 consultation); id. Attach. #8, at 2435 (Nov. 23, 2018 appointment).)  During her November 23, 2018 appointment, Tracey P. requested that Dr. Uddin also address her Chiari malformation and headaches.  (Admin. R. pt. 2 Attach. #8, 2435, ECF No. 13.)  She received a therapeutic injection for left carpal tunnel syndrome on December 10, 2018.  (Id. at 2434.)  On May 13, 2019, Plaintiff had a consultation with Dr. Sara S. Siavoshi at the UCSD Neurological Institute regarding her chronic migraine headaches.  (Id. [Main Doc.] at 1638.)  Tracey P. stated that she had daily headaches that lasted several hours which were moderate-to-severe in intensity, and she took Norco for pain.  (Id.)  Dr. Siavoshi noted that Plaintiff had tried and failed migraine prophylaxis with Effexor, Propranolol, Pamelor, and Amitriptyline.  (Id.)  Following a neurologic examination, Dr. Siavoshi considered Plaintiff to be an excellent candidate for Botox.  (Id. at 1642.)[19]  Plaintiff's first Botox injection was administered by Dr. Siavoshi on August 26, 2019.  (Id. at 1636.)

C.  **Hearing Testimony**

At her first administrative hearing on April 16, 2014, Tracey P. testified that she had constant headaches, at a pain level of three, that felt like a squeezing pain in the back of her head that increased with activity or movement; sharp shooting pain down her neck; and numbness down her arms.  (Admin. R. pt. 1 Attach. #2, 50, 61, ECF No. 12.)  She

---

[19] Botox is used to treat headache disorders.  See SSR 19-4P, 2019 WL 4169635, at *6 (Aug. 26, 2019).

was taking OxyContin twice a day for pain control; Dilaudid for breakthrough pain; Valium for anxiety and muscles; Xanax for anxiety; Effexor for anxiety and depression; and Zofran for nausea.  (Id. at 50, 59.)  Her neurosurgeon told her there was nothing more he could do for her, so her only treatment was taking medication prescribed by her primary doctor.  (Id. at 51.)  The medication gave her "a little bit" of pain relief, but her pain returned with any kind of activity and jumped to a level of seven or eight if she moved the wrong way.  (Id. at 51, 55.)  Her medications made her drowsy and decreased her energy level.  (Id. at 59.)  She had bulging disks in her neck which caused neck pain and affected the range of motion in her neck.  (Id. at 61.)

Tracey P. provided examples about how her medical condition affected her daily life.  She testified that she spent most of the day lying in bed.  (Id. at 51, 57.)  Her husband, who worked nights, cared for their two children.  (Id. at 48-49.)  She was only able to help around the house by preparing pre-packaged food and occasionally folding laundry.  (Id. at 49.)  She went to the emergency room when her pain medications were unable to control her headaches.  (Id. at 62.)

Tracey P. was denied benefits and sought judicial review of the decision.  (Id. at 25-37, 40-91; Admin. R. pt. 2 Attach. #2, 1847-50, ECF No. 13.)  The Commissioner's decision denying benefits was subsequently vacated, and the matter was remanded to the ALJ for further proceedings.  (See Admin. R. pt. 2, Attach. #2, 1892, ECF No. 13.)  At the hearing on remand, held nearly five years later on February 28, 2019, Plaintiff testified that she still had constant pain in the back of her head, at a level between two and three, that increased with any activity.  (Id. Attach. #1, at 1810.)  She used low dose Norco and medical marijuana to control her pain and took Prozac for depression.  (Id. at 1811-12.)  She also suffered from sleep apnea and mild carpal tunnel on the right, and had a history of kidney stones for which she had undergone over twenty surgeries.  (Id.)  When asked by the ALJ how depression affected her daily life, she responded, "It's been a struggle.  I actually was -- I'd stopped taking medicine for a few years ago [sic], and I just recently got back on a month ago."  (Id. at 1812.)  She testified that her headaches

20cv1163-LAB(RBB)

prevented her from being able to work.  (Id. at 1814.)  She was able to perform household tasks for only five to ten minutes before sharp, pulsing pain forced her to lie down.  (Id. at 1814-15.)

## D.   <u>ALJ's Decision on Remand</u>

On June 5, 2019, ALJ Schum, like his predecessor ALJ Nguyen, issued a decision finding that Tracey P. was not disabled.  (Id. [Main Doc.] at 1593-1605.)  The ALJ determined that Plaintiff had not engaged in substantial gainful activity since August 31, 2007, her alleged onset date.  (Id. at 1595.)  He found that Plaintiff had severe impairments including residuals from Arnold Chiari I malformation, status post shunt placements and revisions and cranial compression, history of kidney stones, residuals of repair of cerebral spinal lesion, obesity, and mild carpal tunnel syndrome of the right hand.  (Id. at 1595-96.)  The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (Id. at 1597.)  He stated that Tracey P. had the residual functional capacity to perform sedentary work, which requires the ability to lift and carry ten pounds occasionally and less than ten pounds frequently, sit for six hours, stand/walk for two hours in an eight-hour workday, and push/pull to the same weight limits; she could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; and could frequently handle and finger with the right upper extremity.  (Id. at 1597-98.)  ALJ Schum concluded that Tracey P. should avoid concentrated exposure to extreme cold, loud noise, and vibration; should avoid even moderate exposure to unprotected heights and moving and dangerous machinery; and should not perform constant keyboarding or use of hand tools requiring torqueing motion or pressure with her dominant (right) hand.  (Id.)  He further found that Plaintiff was unable to perform her past relevant work as a program director and mental disability aide, but could perform the requirements of representative occupations including electrical assembler, sealer, and inspector.  (Id. at 1603, 1604.)  The ALJ concluded that Tracey P. had not been under a disability from August 31, 2007, through the date of his decision.  (Id. at 1604.)

## II.   LEGAL STANDARDS

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner.  42 U.S.C.A. §§ 405(g), 421(d) (West 2011).  The scope of judicial review is limited, however, and the denial of benefits "'will be disturbed only if it is not supported by substantial evidence or is based on legal error.'"  Brawner v. Sec'y of Health & Human Servs., 839 F.2d 432, 433 (9th Cir. 1988) (quoting Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)); see also Garrison v. Colvin, 759 F.3d at 1009 (9th Cir. 2014).  Substantial evidence means "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)); see also Biestek v. Berryhill, ___ U.S. ____, ____, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019).  The court must consider the entire record, including the evidence that supports and detracts from the Commissioner's conclusions.  Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005); Ford v. Saul, 950 F.3d 1141, 1154 (9th Cir. 2020).  The district court may affirm, modify, or reverse the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be remanded to the Social Security Administration for further proceedings.  Id.

To qualify for disability benefits under the Social Security Act, a claimant must show two things:  (1) The applicant suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West 2011).  An applicant must meet both requirements to be classified as "disabled."  Id.  The applicant bears the burden of

proving he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

The Commissioner makes this assessment by employing a five-step analysis outlined in 20 C.F.R. § 404.1520.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (describing five steps).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b) (2019).  Second, the Commissioner evaluates whether the claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities.  If not, the claimant is not disabled.  Id. § 404.1520(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  Id. § 404.1520(d).  If not, the claimant's residual functional capacity is assessed and the evaluation proceeds to step four.  Id. § 404.1520(e).  Fourth, the Commissioner determines whether the claimant can do his or her past relevant work.  If the claimant can do their past work, benefits are denied.  Id. § 404.1520(f).  If the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  Id. § 404.1520(g).  If the Commissioner meets this burden and proves that the claimant is able to perform other work that exists in the national economy, benefits are denied.  Id.

## III.   DISCUSSION

Plaintiff makes two arguments.  First, she contends that the ALJ did not meet his burden at step five of the sequential evaluation because he relied on "inconsistent and contradicted" testimony from the vocational expert.  (Pl.'s Mot. Attach. #1 Mem. P. & A. 6-10, ECF No. 17.)  Second, she argues that ALJ Schum failed to articulate clear and convincing reasons to reject her subjective symptom testimony.  (Id. at 10-19.)  The

Commissioner responds that the ALJ properly relied on the vocational expert's testimony and articulated appropriate reasons to discount Tracey P.'s subjective complaints.  (Def.'s Cross-Mot. Summ. J. & Opp'n Attach. #1 Mem. P. & A. 11-21, ECF No. 21.)

## A.   **Plaintiff's Reliance on Job Browser Pro Data to Undermine Vocational Expert's Testimony is Unavailing**

Plaintiff contends that the ALJ failed to meet the Commissioner's burden at step five of the sequential evaluation because the vocational expert testimony upon which he relied was not supported by substantial evidence.  (Pl.'s Mot. Attach. #1 Mem. P. & A. 6-10, ECF No. 17.)

At step five, the burden shifts to the Commissioner to prove that "the claimant can perform a significant number of other jobs in the national economy."  Ford v. Saul, 950 F.3d at 1149 (citing Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002)); see also 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2) ("[T]o support a finding that you are not disabled at this fifth step of the sequential evaluation process, we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors.").  To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines found at 20 C.F.R. Pt. 404 Subpt. P App. 2, or on the testimony of a vocational expert.  Ford, 950 F.3d at 1149 (citing Tackett, 180 F.3d at 1101).

At the February 28, 2019 hearing, the ALJ called a vocational expert to testify as to whether a significant number of jobs existed in the national economy that a claimant with Plaintiff's residual functional capacity, as formulated by the ALJ, could perform. (Admin. R. pt. 2, Attach. #1, 1817, ECF No. 13.)  The vocational expert testified that the occupations of electrical assembler (Dictionary of Occupational Titles ("DOT") 725.684-018), inspector (DOT 669.687-014), and sealer (DOT 559.687-014) had national job numbers of 14,400, 13,000, and 15,000, respectively.  (Id. at 1817-18.)  In response to cross-examination about the source of her data, the vocational expert stated that she relied on U.S. publishing data from the Department of Labor, the Occupational Employment

Quarterly, and Job Browser Pro.  (Id. at 1820-21.)  Based on the vocational expert's testimony, the ALJ concluded at step five that a significant number of jobs existed in the national economy that Plaintiff could perform.  (Id. at 1604.)  Plaintiff contends that the data from Job Browser Pro[20] does not support the vocational expert's testimony, and instead shows only 2,034 electrical assembler, 107 inspector, and 1,037 sealer jobs in the national economy, totaling only 3,178 jobs that Plaintiff could perform.  (Pl.'s Mot. Attach. #1 Mem. P. & A. 8-9, ECF No. 17 (citing Admin. R. pt. 2 [Main Doc.] 1581-89, ECF No. 13).)  She argues that 3,178 jobs is not a "significant number" of jobs in the national economy under step five.  (Id. at 9-10.)

Plaintiff relies on Buck v. Berryhill, 869 F.3d 1040, 1052 (9th Cir. 2017), and argues that "the discrepancy between the vocational expert's testimony of job numbers relying on a data source and the actual numbers as tendered by a claimant from that same data source demonstrates revisable [sic] error[.]"  (Pl.'s Mot. Attach. #1 Mem. P. & A. 9, ECF No. 17.)  The vocational expert, Ms. Hillary, testified that her testimony was consistent with the Dictionary of Occupational Titles.  (See Admin. R. pt. 2, Attach. #1, 1818, ECF No. 13.)  Under cross-examination from Plaintiff's attorney, Hillary said that her data source was "U.S. publishing data," which came from the Department of Labor and was identified as the Occupational Employment Quarterly.  (Id. at 1820.)  The expert continued, "[Y]ou really have to use a tool . . . like Job Pro Browser [sic]" that "gives you the percentage of full-time [jobs]."  (Id. at 1820-21.)  Ms. Hillary testified that she uses Job Browser Pro.  (Id. at 1821.)  At the hearing, Plaintiff's counsel did not challenge the job numbers given by the vocational expert; instead, Plaintiff submitted an alternative set of numbers to the Appeals Council.

---

[20] Job Browser Pro is a "software product designed for career guidance, transition, disability management and legal professionals in many settings" that provides national, state, and regional employment numbers and wage data.  See SkillTRAN, https://skilltran.com/index.php/products/pc-based-solutions/job-browser-pro (last visited Sept. 8, 2021).

Like <u>Rochelle S. v. Saul</u>, Case No. C20-5532-MAT, 2021 U.S. Dist. LEXIS 14139, at *17 (W.D. Wash. Jan. 25, 2021), the Appeals Council here considered Tracey P.'s contention that her job numbers were more accurate than those submitted by the vocational expert.  The court in <u>Rochelle S.</u> concluded that the claimant's numbers were "an alternative opinion regarding the job numbers[]" and did "not demonstrate the evidence offered by the [vocational expert] was not reliable." <u>Id.</u> at *17-18.  The same applies in this case.  <u>Buck</u> was distinguished in <u>Rochelle S.</u>, and is distinguishable here, because the Ninth Circuit noted that in <u>Buck</u> the ALJ "curtailed Buck's cross-examination of the [vocational expert] on the issue of job numbers, promising Buck that he would be able to make a post-hearing submission.  In the end, however, the ALJ did not address Buck's submission." <u>See</u> <u>Buck</u>, 869 F.3d at 1047.

In <u>Rochelle S.</u>, the plaintiff did not show reversible error in the Appeals Council's determination that her job numbers did "not show a reasonable probability that it would change the outcome of the decision." <u>Rochelle S.</u>, 2012 U.S. Dist. LEXIS 14139, at *17 (citing <u>Rochelle S.</u> Admin. R. 2.)  Similarly, Plaintiff's effort to undermine the reliability of the vocational expert's testimony through her lay assessment of vocational information and job data is unavailing.

"An ALJ may take administrative notice of any reliable job information, including information provided by a [vocational expert]." <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1218 (9th Cir. 2005).  "A [vocational expert's] recognized expertise provides the necessary foundation for his or her testimony.  Thus, no additional foundation is required." <u>Id.</u> Other district courts in this circuit have likewise rejected arguments similar to those made by Plaintiff.  <u>See</u> <u>Kirby v. Berryhill</u>, No. SA CV 18-497-E, 2018 WL 4927107, at *5 (C.D. Cal. Oct. 10, 2018) ("counsel's lay assessment of the data derived from the [Occupational Outlook Handbook] and Job Browser Pro does not undermine the reliability of the vocational expert's testimony"); <u>see also</u> <u>Frayer v. Berryhill</u>, No. 2:17-cv-2437-EFB, 2019 WL 1206747, at *5 (E.D. Cal. Mar. 14, 2019) (rejecting plaintiff's analysis of raw job data provided without expert opinion); <u>Colbert v. Berryhill</u>, No.

EDCV 16-2613-KS, 2018 WL 1187549, at *5 (E.D. Cal. Mar. 7, 2018) ("Even if the data from Job Browser Pro in its raw form were considered substantial evidence—and the Court is not persuaded that it is—the data would only serve to show that the evidence can be interpreted in different ways."); Merryflorian v. Astrue, No. 12-CV-2493-IEG (DHB), 2013 WL 4783069, at *5 (S.D. Cal. Sept. 6, 2013) (collecting cases that "uniformly rejected" arguments that Job Browser Pro data undermined vocational experts ' testimony).

Plaintiff's contention does not entitle her to relief.

**B.    ALJ Failed to Articulate Sufficient Reasons for Rejecting Plaintiff's Symptom Testimony**

Plaintiff next contends that the ALJ failed to articulate clear and convincing reasons to reject her subjective complaints.  (Pl.'s Mot. Attach. #1, Mem. P. & A. 10-13, ECF No. 17.)

It is the responsibility of the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.  See Treichler v. Comm'r Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014).  The ALJ must provide sufficient reasoning that permits the court to conduct its own review, because "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Id. (citation and quotations omitted).  Under well-established case law, when the ALJ finds that a Social Security claimant "is not malingering and has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms she alleges, the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so."  Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citing Brown-Hunter v. Colvin, 806 F.3d 487- 488-89 (9th Cir. 2015)).  This requires the ALJ to "specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines that testimony."  Lambert, 980 F.3d at 1277 (citing Treichler, 775 F.3d at 1102).

Plaintiff argues that the ALJ did not connect any of her testimony to his analysis. (Pl.'s Mot. Attach. #1 Mem. P. & A. 13-16, ECF No. 17.)  Relying on the Ninth Circuit's recent decision in <u>Lambert</u>, she contends, "Providing a summary of medical evidence . . . is not the same as providing clear and convincing <u>reasons</u> for finding the claimant's symptom testimony not credible."  (<u>Id.</u> at 15 (citing <u>Lambert</u>, 980 F.3d at 1278).)  The Commissioner insists that the ALJ set forth the following reasons for finding Tracey P.'s allegations less than credible:  first, Plaintiff's statements about her symptoms were not supported by, and were inconsistent with, the objective medical evidence; second, Tracey P. was able to care for her children; third, Plaintiff did not suffer any side effects from her medications and had stopped taking her medications; and fourth, she was taking only low dose Norco and medical marijuana.  (Def.'s Cross-Mot. Summ. J. & Opp'n Attach. #1 Mem. P. & A. 16-21, ECF No. 21.)  The Court finds the ALJ sufficiently, albeit briefly, identified the plaintiff's testimony that he found was not credible, as required by <u>Lambert</u>, and the four reasons specified by the Commissioner constitute the ALJ's determination of Plaintiff's credibility.  As discussed below, however, these reasons are not sufficiently clear and convincing to reject Tracey P.'s pain testimony.

### 1.   Supportability and consistency of Plaintiff's statements with the medical evidence

Judge Schum's primary basis for discrediting Tracey P.'s statements about her symptoms was the medical evidence, which he believed did not support Plaintiff's allegations that she had constant head pain exacerbated by any activity.  (See Admin. R. pt. 2 [Main Doc.] 1598, ECF No. 13.)  Although an ALJ may not disregard a claimant's testimony "solely because it is not substantiated affirmatively by objective medical evidence," (see <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 883 (9th Cir. 2006)), the ALJ may consider whether the alleged symptoms are consistent with the medical evidence as one factor in his evaluation.  <u>See Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1040 (9th Cir. 2007).  According to the ALJ's summary of the medical record in this case, Plaintiff's headaches were "well controlled" following her 2010 decompression surgery, she was

"neurologically intact," and her brain MRI and CT scans were essentially normal. (Admin. R. pt. 2 [Main Doc.] 1598-99, ECF No. 13.)  ALJ Schum also observed that Dr. Bridgeman had assessed Plaintiff as having "a chronic pain syndrome and continuous abuse of opiates."  (<u>Id.</u> at 1598.)  And in his view, the medical evidence submitted after the first ALJ decision in 2014, including records dated through 2018, demonstrated that Tracey P. had not had any "substantial changes" in her medical condition.  (<u>Id.</u> at 1600-01.)  The medical evidence, according to the ALJ, indicated that she had "good pain control with the medications" and her shunt replacement in 2018 did not lead to any complications.  (<u>Id.</u>)

"ALJs must review the whole record; they cannot cherry-pick evidence to support their findings."  <u>Bostwick v. Colvin</u>, Case No. 13cv1936-LAB (MDD), 2015 WL 12532350, at *2 (S.D. Cal. Mar. 30, 2015) (citing <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1207 (9th Cir. 2001)); <u>see also</u> 20 C.F.R. §§ 404.1529(a), 416.929(a) (2019) (providing that the ALJ is required to consider <u>all</u> available evidence, including medical history, medical signs, laboratory findings, and claimant's statements about the effect of her symptoms).  In <u>Holohan</u>, the Ninth Circuit found error when "the ALJ selectively relied on some entries in Holohan's records from San Francisco General Hospital and ignored the many others that indicated continued, severe impairment."  <u>Holohan</u>, 246 F.3d at 1207.  Similarly here, the ALJ cited selectively from the medical evidence in crafting his summary of the medical evidence and, in doing so, ignored evidence contradicting his narrative.  ALJ Schum failed to discuss Plaintiff's November 2014 hospitalization during which she displayed a high CSF pressure and underwent CSF drainage, placement of her ventriculoperitoneal shunt, and removal of her lumboperitoneal shunt.  (<u>See</u> Admin. R. pt. 2 Attach. #7, 2235-36, ECF No. 13.)  The increased CSF pressure found during this hospitalization provided objective evidence of the severe frontal headaches symptoms that Plaintiff reported during that time.  Judge Schum also ignored Plaintiff's numerous documented emergency room visits.  The record, summarized above, reflects no fewer than twelve occasions between 2012 and 2016 (i.e., after her 2010 decompression

surgery), when Plaintiff's severe headache symptoms prompted visits to the emergency room. These visits support her testimony that she experienced pain that her home medications were not always able to control.[21]  See Massey v. Comm'r Soc. Sec. Admin., 400 F. App'x 192, 194 (9th Cir. 2010) (finding that numerous emergency room visits during symptom flare-ups supported subjective complaints); see also SSR 19-4P, 2019 WL 4169635, at *3 (Aug. 26, 2019) ("[Headaches] are typically severe enough to require prescribed medication and sometimes warrant emergency department visits.").[22]  The record as a whole indicates that Plaintiff's headaches continued, even after her decompression surgery, laminectomy, surgical repair of dura leak, shunt placement, CSF drainage, and shunt revisions.  While some of Plaintiff's objective testing, including CT and MRI scans, substantiated her Chiari malformation but showed no acute issues, doctors did find signs to support her symptoms, including elevated CSF pressure, shunts requiring removal or revision, and cervical muscle and occipital tenderness, all referenced in the Court's medical summary above.

Moreover, the ALJ's finding that the medical evidence did not support Plaintiff's subjective headache complaints disregards the manner in which headaches are diagnosed. The SSA recognizes that "In accordance with the [International Classification of Headache Disorders (ICHD-3)] guidelines, the World Health Organization (WHO) protocols, and the [National Institute of Neurological Disorders and Stroke (NINDS)] definition of headache disorders, physicians diagnose a primary headache disorder only after excluding alternative medical and psychiatric causes of a person's symptoms."  SSR 19-4P, 2019 WL 4169635, at *4.  "While imaging may be useful in ruling out other possible causes of headache symptoms, it is not required for a primary headache disorder

---

[21] The Court notes that the record reflects several instances in which Plaintiff's medical providers observed that she was taking highly addictive medications.  None of her physicians, and none of the emergency room records, indicate that she ever displayed drug-seeking behavior.

[22] SSR 19-4P did not become applicable until August 26, 2019, after the issuance of both ALJ decisions in this matter.  SSR 19-4P, 2019 WL 4169635, at *1, *8.  The Court cites to this ruling as helpful guidance only and does not find that the ALJ erred for not applying it.

diagnosis." Id.; see also Spiteri v. Colvin, Case No. 3:16-cv-01937-LB, 2016 WL 7425924, at *11 (N.D. Cal. Dec. 23, 2016) ("there is no test for migraine headaches"); Groff v. Comm'r Soc. Sec., No. 7:05-CV-54, 2008 WL 4104689, at *8 (N.D.N.Y. Sept. 3, 2008) ("there exists no objective clinical test which can corroborate the existence of migraines") (citing The Merck Manual 1376 (17th ed. 1999)); Dalley v. Comm'r Soc. Sec., No. C 00-01687 VRW, 2006 WL 2578269, at *7 (N.D. Cal. Sept. 6, 2006) ("No diagnostic tests are useful, except to exclude other causes.") (citing www.merck.com). Because of the lack of objective useful diagnostic testing, "a migraine diagnosis can turn on a claimant's testimony." Jones v. Berryhill, Case No. 17-cv-04241-LB, 2018 WL 7106674, at *15 (N.D. Cal. Oct. 24, 2018).

As detailed above, Plaintiff's medical records fully document her complaints of chronic and persistent headaches. Her description of her headaches and their disabling effect on her ability to function are consistent throughout the record. (See, e.g., Admin. R. pt. 1 Attach. #2, 50, 61, ECF No. 12 (2014 hearing testimony that headaches were a constant "squeezing pain" in the back of her head that worsened with any type of activity); id. Attach. #8, at 521 (statement to Dr. Stern that headaches worsened with activity and interfered with her normal activities of daily living); id. Attach. #14, at 1465 (characterizing almost daily headaches to physician assistant Kimber as debilitating); Admin. R. pt. 2 Attach. #7, 2237, ECF No. 13 (reporting continuing posterior headaches to Dr. Brown); id. Attach. #8, at 2387 (describing constant "sensation of pressure" at base of skull and top of neck made worse with activity to Dr. Ciacci); id. Attach. #1, at 1810 (testifying at 2019 hearing that she had constant pain in the back of her head that increased with activity).) Plaintiff sought out regular evaluation of and treatment for her headaches from a number of different medical providers, and her diagnosed impairments included headaches. None of Tracey P.'s medical providers, including numerous specialists at UCSD, a preeminent institution, questioned her headache claims, the necessity for medication and other treatments, or the need to continue searching for a remedy for her pain.

1   In sum, the ALJ's determination that Tracey P.'s testimony about the intensity,

2   persistence, and limiting effects of her headaches was not supported by, and was

3   inconsistent with, the medical evidence is not clear and convincing.

4   **2.     Plaintiff's claimed ability to care for her children**

5   Second, Judge Schum noted that the state agency consultant, upon reconsideration

6   of Plaintiff's claim, observed that Tracey P. was "able to care for [two] young children

7   despite her impairments." (Id. [Main Doc.] at 1603 (citing Admin. R. pt. 1 Attach. #3,

8   144, ECF No. 12).)  He cited this as a reason to discount her statements about her pain

9   symptoms.

10   An ALJ may properly consider the claimant's daily activities in evaluating

11   testimony regarding subjective pain.  See, e.g., Thomas, 278 F.3d at 958-59; see also 20

12   C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (claimant's daily activities relevant to

13   evaluating symptoms).  The ALJ may consider inconsistencies between the claimant's

14   testimony and the claimant's conduct, as well as whether the claimant engaged in

15   activities inconsistent with the alleged symptoms.  Thomas, 278 F.3d at 958-59.  Here,

16   the state agency consultant found that Tracey P. was able to care for her children, but

17   there is no support for this in the record.  Plaintiff consistently stated that her headache

18   pain interfered with her ability to care for her children.  (See Admin. R. pt. 1 Attach. #2,

19   48-49, ECF No. 12 (testifying at the 2014 hearing that her husband took care of their

20   children and she was only able to occasionally help with simple household tasks); id.

21   Attach. #11, at 1060 (reporting to Dr. Bridgeman that she was "[u]nable to help take care

22   of her kids at home due to pain symptoms."); Admim. R. pt. 2 Attach. #10, 2718, ECF

23   No. 13 (psychotherapy notes indicating that Tracey P.'s pain "keeps her from playing

24   with her children").)  In her disability report, Plaintiff stated that she was having to "do

25   more with [everyday] tasks with the family" as her children got older and "[w]ith all the

26   increased activity I have increased pain."  (Admin. R. pt. 1 Attach. #6, 291, ECF No. 12.)

27   She continued, "I am unable to really be a fun part of my famil[y's] lives since I can't

28   play with my daughters unless I am sitting and take breaks often."  (Id.)  Neither the ALJ

29

nor the Commissioner point to any evidence that contradicts these statements.  Although the ALJ referred to a medical note that Plaintiff "can perform all [activities of daily living] without assistance," (see id. Admin. R. pt. 2 [Main Doc.] 1599, ECF No. 13 (citing Admin. R. pt. 1 Attach. #12, 1135, ECF No. 12)), it is unclear what types of activities this note was referring to.  In addition, this notation was made during the course of an emergency room visit for headache, dizziness, and weakness and thus was taken out of context by the ALJ.  The purpose of emergency department care, when it comes to headaches, "is to determine the correct headache diagnosis, exclude secondary causes of the headache (such as infection, mass-lesion, or hemorrhage), initiate acute therapy in appropriate cases, and provide referral to an appropriate healthcare provider for further care and management of the headaches."  See SSR 19-4P, 2019 WL 4169635, at *3.  It is not a comprehensive assessment of a claimant's functional abilities.

The finding that Tracey P. was able to care for her young children was not supported by the evidence in the record and does not constitute a clear and convincing reason to discount her subjective symptom testimony.

### 3.    Claim that Plaintiff did not experience side effects from medications and stopped taking medications

The Commissioner argues that ALJ Schum's third proffered reason for finding Plaintiff's subjective symptom testimony not completely convincing was that "[t]here is no indication of significant adverse side effects from [her] medications" and Tracey P. "testified she stopped using any medications 'for a few years,'" which indicated to the ALJ that "her symptoms were not so severe as she claimed for a long period."  (Admin. R. pt. 2 [Main Doc.] 1603, ECF No. 13.)

There is no support in the record for either of these statements and thus they are not clear and convincing.  Plaintiff's physicians, on numerous occasions, expressed concern about the addictive quality of her pain medications and her dependence on or potential abuse of opioids.  (See Admin. R. pt. 1 Attach. #14, 1473, 1544, 1557, ECF No. 12; Admin. R. pt. 2 Attach. #7, 2241, ECF No. 13; id. Attach. #8, at 2462; id. Attach. #9,

1    at 2563.)  Additionally, Tracey P. testified that her medications made her drowsy and

2    decreased her energy level.  (See Admin. R. pt. 1 Attach. #2, 59, ECF No. 12; see also id.

3    Attach. #6, at 290 (disability report completed by Plaintiff indicating that Flexeril,

4    Percocet, Xanax, and Zofran made her drowsy)).)  The ALJ points to no evidence

5    contradicting this testimony, and prescription opioids are known to have side effects.  See

6    U.S. Dep't Health and Human Servs.,

7    https://www.hhs.gov/opioids/prevention/index.html (last visited Sept. 8, 2021) ("In

8    addition to the serious risks of addiction, abuse, and overdose, the use of prescription

9    opioids can have many side effects, even when taken as directed.").  Moreover, Tracey P.

10   did not, as the ALJ claims, testify that she stopped using "any" medications for a few

11   years.  (See Admin. R. pt. 2 [Main Doc.] 1603, ECF No. 13.)  Rather, when asked by the

12   ALJ whether she had "any type of psychological or mental issues," she responded that

13   she had depression for which she was taking Prozac and stated, "I actually was -- I'd

14   stopped taking medicine for a few years ago [sic], and I just recently got back on a month

15   ago."  (See id. Attach. #1, at 1812.)  It is clear from the testimony that Tracey P. was

16   referring only to medication for psychological or mental issues, not to pain medication.

17   While the record shows, as detailed further below, that she used medical marijuana in

18   place of prescribed medications for a period of time, there was no extended period during

19   which she reported being off all of her prescription medications.

20        **4.    Use of "only" low dose Norco and medical marijuana**

21        The fourth reason identified by the Commissioner for the ALJ's discounting of

22   Plaintiff's subjective symptom testimony was that she was using only low dose Norco

23   and medical marijuana for her pain.  (Def.'s Cross-Mot. Summ. J. & Opp'n Attach. #1

24   Mem. P. & A. 18, ECF No. 21; Admin. R. pt. 2 [Main Doc.] 1598, ECF No. 13.)

25        In assessing a claimant's subjective symptoms, an ALJ may properly consider the

26   "type, dosage, effectiveness, and side effects of any medication" a claimant has taken to

27   alleviate her pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv).

28   Receiving only "minimal, conservative treatment" is a valid reason to discredit a

claimant's symptom testimony.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999); see also Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation omitted).  The Court is not persuaded that Norco can be considered "conservative" treatment even when taken at its lowest dose.  "The consistent use of Norco, a strong opioid medication, cannot accurately be described as 'conservative' treatment."  Bucknell v. Berryhill, Case No. ED CV 18-0261 AS, 2018 WL 6198459, at *4 (C.D. Cal. Nov. 27, 2018) (citing cases); see also Childress v. Colvin, Case No. 13-cv-03252-JSC, 2014 WL 4629593, at *12 (N.D. Cal. Sept. 16, 2014) ("It is not obvious whether the consistent use of [Norco] (for several years) is 'conservative' or in conflict with Plaintiff's pain testimony . . . .").

The use of medical marijuana has been considered "conservative" by some courts and not conservative by others, (compare Wilson v. Colvin, 583 F. App'x 649, 651 (9th Cir. 2014) (relying on marijuana use in concluding claimant pursued only conservative treatment), with Akers v. Colvin, Civil No. 12-01944-CL, 2014 WL 1236293, at *7 (D. Or. Mar. 25, 2014) (finding the plaintiff's use of medical marijuana was not a clear and convincing reason to reject her credibility as conservative treatment)).  In the context of the record as a whole, Plaintiff used medical marijuana alone for a limited period of time, between approximately January and September 2017, and perhaps in September 2018. (See Admin. R. pt. 2 Attach. #7, 2280, ECF No. 13 (note dated May 19, 2017, stating that Tracey P.'s home medication consisted of "only medical marijuana since January"); id. Attach. #9, at 2555 (Sept. 6, 2017 treatment note by Dr. Papalia reflecting that her patient reported "getting by on past 6 months with medical marijuana but now cannot afford to buy"); id. at 2594 (Dr. Uddin's Sept. 10, 2018 report stating that Plaintiff was not using any prescription medications and smoked medical marijuana); but see id. Attach. #8, at 2404 (medical record dated Mar. 15, 2018 indicating that Plaintiff was taking Norco and using a vapor pipe with marijuana for relief of her pain symptoms); see also id. [Main

Doc.] at 1638 (Dr. Siavoshi's May 13, 2019 progress note stating that Plaintiff "takes low dose [N]orco for severe headaches").)

The medical evidence establishes that Plaintiff took a variety of medications, including opioids with addictive qualities, for the majority of the time span at issue in this case. (See, e.g., Admin. R. pt. 1 Attach. #14, 1473, ECF No. 12) (reflecting use of Norco in 2011); id. Attach. #9, at 737 (prescribed Percocet in 2012); id. Attach. #11, at 1060 (list of medications in 2013 including Norco, Percocet, Valium, and Xanax); id. Attach. #14, at 1544 (taking Percocet, OxyContin, and Dilaudid in 2014); Admin. R. pt. 2 Attach. #8, 2499-500, ECF No. 13 (in 2015, taking Effexor, Percocet, Soma, Valium, Xanax, and Zofran); id. at 2480 (Toradol injection given for headaches in 2016 because Plaintiff reported pain medications were not helping).) She turned to medical marijuana not because her symptoms had decreased, but because she felt it was "more natural" and it had gotten her off the addictive opioid pain medications she had taken for years and had been cautioned against using. (Admin. R. pt. 2 Attach. #9, 2559-60, ECF No. 13.) Even if the use of low dose Norco and medical marijuana was a valid reason to discount Plaintiff's pain testimony, Tracey P.'s reliance on these pain relievers was a more recent development in the context of the record as a whole. Plaintiff's use of these substances to reject her pain testimony over the course of many years is not clear and convincing evidence. The medical records establish that Plaintiff sought more than "minimal, conservative treatment," as evidenced by the numerous surgeries, procedures, and treatments she has undergone, and the variety of medications she has tried.

Furthermore, the record does not support the ALJ's interpretation of the medical evidence as reflecting that Plaintiff's symptoms improved with treatment or were well-controlled with medication. Although the medical records indicated at times that Plaintiff's condition was "stable," they do not reflect that she was pain-free over a sustained period of time or that her headaches would not present a limitation to working. Even when her condition was noted as "stable," she complained of frequent and chronic headaches. (See, e.g., id. Attach. #8, at 2499 ("stable with current meds" with pain level

33

at six of ten); id. at 2464 ("[p]ain stable on current meds" but remained at a level of four out of ten).)  Tracey P.'s prescription medications were often unable to control her symptoms, as evidenced by her numerous visits to the emergency room.  See Costa v. Berryhill, 700 F. App'x 651, 653 (9th Cir. 2017) (finding that seeking emergency room treatment for severe migraines undermined ALJ's finding that migraines were "well controlled" with medication).

In sum, the ALJ's rationale that Plaintiff's use of low dose Norco and medical marijuana to control her pain constituted a legitimate reason to reject her symptom testimony was not clear and convincing.

## C.   Remedy

Plaintiff argues that the proper remedy in this case is remand for the payment of benefits.  (Pl.'s Mot. Attach. #1 Mem. P. & A. 19-20, ECF No. 17.)  The Commissioner contends that the case should be remanded for further administrative proceedings if the Court finds any grounds for overturning the agency's decision.  (Def.'s Cross-Mot. Summ. J. & Opp'n Attach. #1 Mem. P. & A. 21, ECF No. 21.)

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  42 U.S.C. § 405(g); Treichler, 775 F.3d at 1090.  The court may exercise its discretion and direct an award of benefits "where no useful purpose would be served by further administrative proceedings and the record has been thoroughly developed."  Hill v. Astrue, 698 F.3d 1153, 1162 (9th Cir. 2012) (citation omitted).  Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if the improperly discredited evidence were credited as true.  Garrison, 759 F.3d at 1020 (citations omitted).  Even if all three requirements are met, the court retains to flexibility to remand for further proceedings

when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.  Id. (citing Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003)).

Here, Plaintiff has satisfied all three conditions of the credit-as-true rule.  First, there is no need to further develop the record or hold further administrative proceedings. The case has been pending for over nine years, Plaintiff has testified at two administrative hearings, and the case was previously remanded for further proceedings. Remanding now for additional administrative proceedings would serve only to provide a third opportunity for the Commissioner to find and offer other reasons to reject Plaintiff's testimony.  See Garrison, 759 F.3d at 1021; see also Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication.").  Second, as discussed extensively above, the ALJ failed to provide legally sufficient reasons to reject Tracey P.'s pain testimony.  Third, the vocational expert testified that a hypothetical person with the residual functional capacity formulated by the ALJ and absent from work more than three times a month would not be able to sustain competitive employment.  (Admin. R. pt. 2 Attach. #1, 1819, ECF No. 13.)  The vocational expert further testified that this hypothetical individual would also be unable to work if she required an extra ten-minute break every thirty minutes beyond the normal break period.  (Id. at 1819-20.)  Plaintiff testified that she had constant headache pain that increased with any activity and that she was able to perform household tasks for only five to ten minutes before needing to take a break due to pain.  (Id. at 1810, 1814-15.)  If Plaintiff's testimony about her headache symptoms was credited as true, the ALJ would be required to find her disabled on remand.  Accordingly, Plaintiff meets the requirements of the credit-as-true standard.

The Court next turns to the question of whether it should nonetheless exercise "flexibility" under Connett and remand for further proceedings.  The Commissioner does not point to any evidence in the record that casts serious doubt that Plaintiff is disabled.

The Court's review of the medical evidence has also revealed nothing that creates serious doubt about Tracey P.'s entitlement to disability benefits.  Since August 31, 2007, Plaintiff has been afflicted with headaches that have impacted her ability to perform normal activities, and they have been of such severity that Tracey P. has been hospitalized and sought emergency room treatment on numerous occasions.  She consulted with numerous physicians, including specialists; tried various treatment modalities, including multiple surgeries; and continually took prescription medication, including highly addictive opioids, to address her symptoms.  Still, her chronic headaches persisted.  After considering Defendant's arguments and its own review of the record, the Court has no serious doubt that Plaintiff is disabled.

In sum, Plaintiff satisfies all three requirements of the credit-as-true rule, and a careful review of the record discloses no reason to seriously doubt that she is disabled.  Therefore, the Court recommends a remand for an award of benefits.

**D.    Notice of New Authority**

Plaintiff filed a Notice of New Authority that cites Collins v. Yellen, 594 U.S. ____, ____, 141 S. Ct. 1761, 210 L. Ed. 2d 432 (2021), and Seila Law, LLC v. Consumer Fin. Prot. Bureau, ___ U.S. ____, ____, 140 S. Ct. 2183, 207 L. Ed. 2d 494 (2020), and refers to a July 8, 2021 Memorandum Opinion for the Deputy Counsel to the President regarding the scope of the President's constitutional authority to remove the Commissioner of Social Security [ECF No. 24].  The Court will not consider this supplemental authority because Plaintiff has made no showing how either case or the memorandum opinion supports her claim that the ALJ's decision regarding her disability claim was incorrect.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) (stating that a party fails to adequately brief an issue when it is raised in a perfunctory manner without supporting arguments and authority); see also Maves v. First Horizon Home Loans, 461 Fed. App'x 636, 638 (9th Cir. 2011) (declining to address party's argument when her brief was "devoid of any reasoned argument[]" and the issue was "raised in . . . [a] perfunctory fashion").  Additionally, other courts have found these

cases and the memorandum opinion irrelevant to the consideration of the merits in social security disability actions.  See <u>Jon E.C. v. Kijakazi</u>, Case No. EDCV 20-01257 PVC, 2021 U.S. Dist. LEXIS 197598, at *1 n.3 (Oct. 13, 2021) ("Having considered Plaintiff's submission, the Court finds that the authority cited therein would not affect the disposition of this case."); <u>see also</u> <u>Keith P. v. Comm'r Soc. Sec.</u>, Case No. 3:20-cv-05624-TLF, 2021 U.S. Dist. LEXIS 187242, at *9 (Sept. 29, 2021) ("[T]he Court finds that the authority would not affect the disposition of this case.").

## IV.   CONCLUSION

For the reasons stated above, the Court recommends that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's cross-motion for summary judgment be **DENIED**, and the case be remanded for an award of benefits.

This Report and Recommendation will be submitted to the Honorable Larry A. Burns, United States District Court Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a copy on all parties on or before <u>November 17, 2021</u>.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be served and filed on or before <u>December 1, 2021</u>.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  October 27, 2021

Hon. Ruben B. Brooks
United States Magistrate Judge

20cv1163-LAB(RBB)